IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAN COOK; and ELLIOTT RUDOLPH, | : |
| *Plaintiffs*, | : |
| v. | : Case No.: 2:24-cv-1030 |
| INTEGRITY CONSTRUCTION AND WINDOWS, INC., | : |
| *Defendant*. | : |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiffs, Dan Cook and Elliot Rudolph, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Justin M. Bahorich, Esquire, who files the within Complaint in Civil Action against Defendant, Integrity Construction and Windows, Inc.., of which the following is a statement:

## PARTIES

1. Plaintiff, Dan Cook (hereinafter "Plaintiff" or "Mr. Cook"), is an adult individual who currently resides at 1738 Polk St, Aliquippa, PA, 15001.

2. Plaintiff, Elliot Rudolph, (hereinafter "Plaintiff" or "Mr. Rudolph") is an adult individual who currently resides at 285 Palma St, North Versailles, PA, 15137.

3. Defendant, Integrity Construction and Windows, Inc., ("Integrity" or "Defendant") is a Pennsylvania business corporation with its headquarters at 1520 E Walton Ave., Altoona, Pennsylvania 16602 and a location at 2000 Tower Way, Greensburg, Pennsylvania 15601.

**JURISDICTION AND VENUE**

4. This action arises under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981 and the Wage Payment and Collection Law (hereinafter "WPCL") 43 P.S. §260.1 et seq.,

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

6. Plaintiffs are residents and citizens of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

**FACTUAL ALLEGATIONS**

**Defendant's company**

7. Defendant is a construction company focusing on window and door installation.

8. Defendant offers its employees in the position of Salesman, commission-based compensation to its employees. This commission is contingent upon the completion of an installation.

9. Upon information and belief, the majority of Defendant's employees and staff are white.

10. Further, Mr. Cook and Mr. Rudolph were the only two black employees for Defendant.

11. In February of 2023, Mr. Rudolph began working for Defendant as a Salesman.

12. In May of 2023, Mr. Cook began working for Integrity as a Salesman in Integrity's Greensburg satellite office.

13. Mr. Cook and Mr. Rudolph are members of a protected class in that they are black males.

14. Defendant intentionally targeted Mr. Cook and Mr. Rudolph with discriminatory animus based on their race by failing to properly pay either of them earned commissions and unlawfully terminating their employment under the guise of failing to attend a scheduled appointment.

**Plaintiff Cook**

15. Mr. Cook began working for Integrity in May 2023 as a Salesman in Defendant's Greensburg satellite office.

16. At the onset of his employment, Defendant promised to pay Mr. Cook a commission for every job he completed in the amount of 9% for leads sent by the company, and 12% for leads Mr. Cook generated himself.

17. However, once Mr. Cook began working, Defendant never paid him commission or gave him any updates on the payout schedule.

18. When Mr. Cook asked Defendant for a printout of all the deals he made, Defendant's management told him that he would have to call corporate for that information.

19. Although Mr. Cook continued to ask about his unpaid commission, Defendant ignored Mr. Cook's inquiries.

20. Instead, Defendant deliberately sabotaged Mr. Cook's lead appointments on two separate occasions by making him drive over three (3) hours for appointments that he was aware had been canceled.

21. On August 8, 2023, Defendant's Vice President of Sales, Tim Dixon ("Mr. Dixon") told Mr. Cook, "Bring in your samples and you are done," effectively terminating his employment.

22. Mr. Cook once again inquired into his unpaid commission.

23. Mr. Dixon told Mr. Cook that he had to return his samples before he could have a printout of his payout.

24. Defendant never compensated Mr. Cook for the sales he made throughout the entirety of his employment.

25. As such, Defendant still owes Mr. Cook compensation for the sales he made.

26. Mr. Cook generated a total of three leads during his employment with Defendant.

   a. Lead 1 totaled $ 10,461.00.

   b. Lead 2 totaled $ 10,784.00.

   c. Lead 3 totaled $ 12,600.00.

27. Therefore, Mr. Cook is entitled to $4,061.40 for the leads he generated.

28. Additionally, Mr. Cook is entitled to a nine percent commission on the leads generated by Defendant.

29. Mr. Cook is entitled to approximately $94,061.40 commission on the leads generated by Defendant.

**Plaintiff Rudolph**

30. In February 2023, Mr. Rudolph began his employment with Defendant as a Salesman.

31. Defendant had promised that Mr. Rudolph would be compensated with a six percent commission on the sales he made once the job was completed.

32. As a Salesman, Mr. Rudolph would meet homeowners at their house and give a demonstration of the products like windows or doors.

33. Appointments were to be made with each potential client and there was a seventy (70) mile distance limit.

34. However, Mr. Rudolph was sent 109 miles away to a client who had previously called to cancel.

35. This was not the first instance that Defendant failed to properly schedule people or notify Mr. Rudolph of a cancellation.

36. Additionally, in another instance, Mr. Rudolph was told to go to a client's house on a certain day. Upon arrival, the client called to cancel because they were told that Mr. Rudolph would come the day before.

37. This was a consistent issue that Mr. Rudolph would face.

38. Moreover, Mr. Rudolph would not be paid the commission that he was promised and entitled to.

39. Mr. Rudolph raised the issue with his manager, Chance LNU ("Mr. Chance").

40. Mr. Chance told Mr. Rudolph that the Defendant failed to pay him the commission he was owed, indicating that there was nothing he could do about Mr. Rudolph's unpaid commission.

41. After months of not being paid the commission he earned, Mr. Rudolph was constructively discharged and forced to look for new employment.

42. Throughout the entire six months of his employment, Defendant only paid Mr. Rudolph's commission once.

43. However, this payment was spread out over four paychecks instead of being paid in one installment.

44. Defendant informed Mr. Rudolph that they would pay a smaller amount each week to prevent him from "being slammed with taxes,"

45. Upon information and belief that Defendant said this to Mr. Rudolph as a way to avoid paying the owed commission.

46. Additionally, Defendant withheld $300.00 from Mr. Rudolph's weekly pay for "messing up a lead."

47. There was a protocol in place if Mr. Rudolph was running late for an appointment, which was to inform the call center.

48. Mr. Rudolph followed the proper protocols, and Defendant still withheld the money that was owed.

49. Mr. Rudolph is entitled to a commission for approximately 182 jobs throughout his employment with Defendant. This amounts to approximately $109,200.00 in unpaid commission.

    a. **<u>Defendant intentionally targeted Plaintiffs based on their race.</u>**

50. Both Mr. Rudolph and Mr. Cook were the only Black employees working for Respondent.

51. Mr. Dixon consistently made comments about Mr. Rudolph and Mr. Cook being black.

52. On one occasion, Mr. Dixon mentioned, "Wait until they get a look at you guys [Mr. Rudolph and Mr. Cook] out there in Punxsutawney, out in the Amish country." Implying that Amish people would have a certain reaction because they are black.

53. Mr. Dixon also stated, "They aren't used to seeing you guys [Black people] out there."

54. During this time, Mr. Rudolph and Mr. Cook were also told by Mr. Dixon to "Make sure that you guys have manners." Implying that, because Mr. Rudolph and Mr. Cook are Black, they would not act professionally when working.

55. Defendant is a small business that did not have a proper human resources structure.

56. Mr. Rudolph and Mr. Cook were unsure how to address the continuous and ongoing racially charged comments made by Mr. Dixon because there was no structure to follow.

57. Moreover, the Human Resources department that they were told to go to, was Mr. Dixon's daughter.

58. Mr. Rudolph and Mr. Cook had no resources to utilize for complaints of discrimination.

59. Additionally, Defendant would withhold payments when there was false information provided by clients or cancelled appointments.

60. In these instances, wherein a customer had called and canceled an appointment, Mr. Rudolph was unaware and had shown up.

61. This false information that was given resulted in Mr. Rudolph's payment being withheld.

62. Mr. Chance, who is white, did not have his payments withheld when there was a cancellation of an appointment.

63. Mr. Rudolph had brought this issue to Mr. Chance and said he would call back with updated information.

64. Upon information and belief, Mr. Chance did not talk to Defendant about the payment that was withheld, and nothing was done to remedy the situation.

65. Mr. Rudolph and Mr. Cook experienced racially charged comments and discrimination while being employed by Defendant.

### b. Retaliation

66. Mr. Rudolph and Mr. Cook brought up the fact that they were not being paid accordingly and what was promised on multiple occasions.

67. Additionally, because they were the only Black people who worked there, faced discrimination that similarly situated counterparts did not experience.

68. Defendant purported the same pretextual reasoning that led to Mr. Cook's termination and to Mr. Rudolph's constructive termination.

69. Mr. Cook was told that the assigned leads for the day had canceled their appointments because he was late or failed to show up for the appointment.

70. Mr. Rudolph was told that he was "burning a lead" because he was late or failed to show up for the appointment, even though he called Defendant to inform them he was running a few minutes behind schedule. In response to this, Defendant docked Mr. Rudolph's pay, which led to his constructive termination.

71. However, this was false information as Defendant failed to communicate that the leads had never scheduled an actual appointment and there was no reason for Mr. Cook and Mr. Rudolph to be assigned to these leads.

72. Upon Information and belief that Mr. Cook and Mr. Rudolph were terminated because they are Black and had repeatedly asked about being paid what they were owed.

# COUNT I
## RACIAL DISCRIMINATION IN VIOLATION OF SECTION 1981
*(All Plaintiffs v. Defendant)*

73. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

74. 42 U.S.C. § 1981(a) provides that:

> All persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens.

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); *see also*, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

75. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

76. Defendant perpetuated the racial discrimination of the Plaintiffs in the workplace as delineated hereinabove.

77. Plaintiffs endured racial discrimination by having to hear racially charged comments by Mr. Dixon.

78. Since there was not a properly set up Human Resources department and Mr. Dixon's daughter oversaw this department, the Plaintiffs could not report the racial discrimination.

79. Plaintiffs, as a result of this racial discrimination, was subjected to the ultimate adverse employment action when they were terminated and therefore deprived of the same rights to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

80. Defendant's actions against Plaintiffs were undertaken with reckless indifference to his federally protected right to make and enforce contracts irrespective of his race.

81. As a direct and proximate result of the aforementioned conduct, Plaintiffs suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience all in the past present and future.

82. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

WHEREFORE, Plaintiffs, Elliot Rudolph and Dan Cook, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of front pay, back pay, compensatory and punitive damages, costs, and reasonable attorney's fees.

## COUNT II
## UNPAID WAGES IN VIOLATION OF THE
## WAGE PAYMENT AND COLLECTION LAW
*(All Plaintiffs vs. Defendant)*

83. Plaintiffs incorporate the allegations contained in the paragraphs, above, as if fully set forth at length herein.

84. The Wage Payment and Collection Law ("WPCL") "provides 'employees a statutory remedy to recover wages and other benefits that are contractually due to them.'" *Betras v. Oli-Car Inc.*, No. 2:21-CV-00873-CCW, 2021 U.S. Dist. LEXIS 215218, at *13 (W.D. Pa. Nov. 8, 2021) (quoting *Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148, 150 (Pa. 1997)).

85. Wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term "wages" also includes fringe benefits or wage supplements…" 43 P.S. §260.2(a).

86. Defendant is an "employer" as defined by 43 P.S. §260.2a.

87. Plaintiffs are "employees" under the Pennsylvania WPCL, 43 P.S. §260.1 et seq. Although, "employee" is not explicitly defined within the WPCL, Pennsylvania courts have interpreted the term liberally to cover "those who work in Pennsylvania…" *Frank Burns, Inc. v. Interdigital Communs. Corp.*, 704 A.2d 678, 680-81 (Pa Super. 1997) (citing *Killian v. McCulloch*, 873 F. Supp. 938, 942 (E.D. Pa. 1995)).

88. Plaintiffs were contracted to work at a rate of $10.00 per hour plus a nine percent commission if Defendant provided the lead, and a twelve percent commission if Mr. Cook brought in a lead.

89. Defendant failed to pay the Plaintiffs the commission that they earned.

90. Plaintiffs were contractually entitled to the full extent of his commission.

WHEREFORE, Plaintiffs, Elliot Rudolph and Dan Cook, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including awards of back pay, front pay, compensatory and liquidated damages, costs, attorney's fees, and other such relief as deemed proper.

**COUNT III**
**BREACH OF CONTRACT**
*(All Plaintiffs v. Defendant)*
*(Pled in the Alternative)*

91. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

92. Plaintiffs were entitled, as part of the Defendant's employment contract, to be paid for all hours worked.

93. Defendant was bound by the duty of good faith and fair dealing. As such, Defendant had a duty to compensate the Plaintiffs for all earned commissions.

94. Defendants failed to pay the Plaintiffs for all earned commissions.

95. All conditions precedent to recovery have occurred.

96. As a direct result of this breach of contract, Plaintiffs have suffered damages as set forth hereinabove.

WHEREFORE, Plaintiffs, Elliot Rudolph and Dan Cook, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including awards of back pay, front pay, compensatory and liquidated damages, costs, attorney's fees, and other such relief as deemed proper.

## COUNT IV
### QUANTUM MERUIT / UNJUST ENRICHMENT
*(All Plaintiffs v. Defendant)*
*(Pled in the alternative)*

97. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

98. Plaintiffs had an expectation of payment for all earned commission from Defendant.

99. Plaintiffs conferred a benefit upon Defendant.

100. Defendant appreciated the benefit of the Plaintiffs' time and efforts.

101. It would be manifestly unjust if the Defendant's acceptance and retention of such benefits were permitted without payment of value to the Plaintiffs.

WHEREFORE, Plaintiffs, Elliot Rudolph and Dan Cook, respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, including, but not limited to, wage loss, loss of income, reimbursement, restitution, disgorgement from Defendants of the value of the benefits conferred by Plaintiff, and such other legal and equitable relief as the Court deems just and proper.

**JURY TRIAL DEMANDED.**

Respectfully submitted,

**J.P. WARD AND ASSOCIATES, LLC**

Date: July 16, 2024

By: _____
Justin M. Bahorich
(Pa. I.D. No. 329207)

J.P. Ward and Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

*Counsel for Plaintiff*